FB5HRODS                           Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              15 CR 02 (CM)

5    JOSE RODRIGUEZ,

6                  Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          November 5, 2015
9                                         5:00 p.m.

10
     Before:
11
                        HON. COLLEEN MCMAHON,
12
                                          District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER DIMASE
17        Assistant United States Attorney

18   LAW OFFICE OF JOSHUA L. DRATEL
          Attorney for Defendant
19   JOSHUA L. DRATEL
     WHITNEY SCHLIMBACH
20

21

22

23

24

25

1          (Case called)

2          MR. DIMASE:  Good afternoon.  Christopher DiMase for

3    the government.

4          MR. DRATEL:  Good afternoon, your Honor.  Joshua

5    Dratel for Mr. Rodriguez who's seated beside me.  Also at

6    counsel, Whitney Schlimbach, an associate in my office.

7          THE COURT:  Excellent.  Thank you.

8          This matter is on for sentencing under 15 Crim 02,

9    United States of America v. Jose Rodriguez.  Mr. Rodriguez,

10   having been found guilty by a plea to one count of felon in

11   possession of a firearm in violation of 18 United States Code,

12   Section 922(g) (1), this crime carries a statutory maximum

13   penalty of ten years' imprisonment, three years' supervised

14   release, $250,000 fine, $100 special assessment.  It is a Class

15   C felony.

16         In connection with today's sentencing, I have received

17   and reviewed the presentence report prepared by senior United

18   States Probation Officer Colleen Tyler, and it's dated

19   September 3, 2015.  I have a sentencing submission from the

20   government dated October 28, 2015.  I have a very lengthy

21   sentencing submission from Mr. Dratel dated October 13, 2015.

22   Attached to it are a number of letters in support of the

23   defendant, some information about his music career, some

24   information about the work that he has done on addiction while

25   he has been incarcerated.

1          I have received, I should say, two other letters from

2     Mr. Dratel, both dated November 5.  One is Mr. Rodriguez's work

3     performance rating evaluating his work as a pre-drug program

4     instructor.  One is a different rating, so I've got two of

5     them.  And then I have a letter that arrived here in an

6     envelope from Mr. Christopher Olivas on behalf of

7     Mr. Rodriguez.  Says he's a very good friend, advocate for the

8     community, good guy.

9          Is there anything else I should have seen in writing

10    prior to today's proceedings from the government?

11          MR. DIMASE:  No, your Honor.

12          THE COURT:  From the defendant?

13          MR. DRATEL:  No, your Honor.

14          THE COURT:  Has the government reviewed the

15    presentence report?

16          MR. DIMASE:  Yes, we have, your Honor.

17          THE COURT:  Any additions, deletions, or corrections?

18          MR. DRATEL:  No.

19          THE COURT:  Do you agree with probation's

20    recalculation of the guideline?

21          MR. DIMASE:  Your Honor, I believe that the guidelines

22    calculation set forth in the probation report is accurate.  As

23    we noted in our submission, we are seeking a range in the

24    stipulated guidelines range set forth.

25          THE COURT:  You're standing by the plea agreement?

1          MR. DIMASE:  But I do believe that they are correct

2     about the range.  And because it was a YO conviction, the

3     government was not aware of that particular offense when it

4     provided the plea agreement to the defense.

5          THE COURT:  Okay.  Does the government wish to be

6     heard on sentencing?

7          MR. DIMASE:  Yes.

8          THE COURT:  Then please speak away.

9          MR. DIMASE:  Thank you, your Honor.  I just want to

10    briefly address the issues about the robberies in case that are

11    raised by Mr. Dratel.  I think it's probably less of an issue

12    with Mr. Rodriguez than some of the other defendants in this

13    case, but I think Mr. Dratel, in his advocacy for

14    Mr. Rodriguez, is the first attorney to bring this issue as

15    much to the fore.

16         THE COURT:  Yes.  I mean, he wrote this great brief,

17    so --

18         MR. DIMASE:  Well, your Honor, I have a few points I

19    think that are important to consider here.  No one is going to

20    argue that Mr. Rodriguez was involved until the day of the

21    robbery.  I mean, the evidence is what it is.  He's obviously

22    not the most culpable person in this case.  That's clear.  But

23    that you said, I think some of the concerns raised by

24    Mr. Dratel about these sting operations don't really apply

25    here.  Number one, the evidence is clear that Mr. Lopez was the

FB5HRODS                          Sentence

```
 1   individual who approached the CS about committing the robbery,
 2   as we've discussed in other sentencings.
 3             THE COURT:  Yes, Mr. Lopez was the instigator here.
 4             MR. DIMASE:  That's number one.
 5             THE COURT:  Really no question about that.
 6             MR. DIMASE:  And I think --
 7             THE COURT:  Nobody else could be tarred with that
 8   brush, but Mr. Lopez was the instigator.
 9             MR. DIMASE:  Well, I think that's absolutely right, no
10   one else can be tarred with that brush, but I think that law
11   enforcement bears less of a role because it was Lopez who
12   brought this to --
13             THE COURT:  Yeah, this isn't --
14             MR. DIMASE:  -- law enforcement.
15             THE COURT:  This is not the Newburg Forum.
16             MR. DIMASE:  And the second issue, your Honor, is
17   nobody directly from law enforcement communicated with
18   Mr. Rodriguez.  He was not the target of a law enforcement
19   investigation.  CS didn't reach out to him.  He showed up on
20   the day of the robbery because he was -- he was contacted by
21   other individuals who were in the process of planning this
22   robbery.  So all the arguments about law enforcement targeting
23   people just don't really apply to Mr. Rodriguez.
24             THE COURT:  Agreed.
25             MR. DIMASE:  The participants brought him in.
```

1           And so a lot of the issues that are raised by

2    Mr. Dratel's brief -- casting a wide net, focusing on certain

3    communities, sending CSs out to find any old person they can to

4    commit a crime -- I just don't think those issues are in play

5    here in this case.  And I also just want to note that the

6    Hudson case which Mr. Dratel cites and compares at some length

7    to the facts of this case was actually overturned by the Ninth

8    Circuit on appeal, and I have the cite for that.  I don't know

9    how much it really matters, but the Ninth Circuit in *U.S. v.*

10   *Dunlap* in late 2014 overturned the court's holding; and they

11   discussed how, in that case, the defendants "responded with

12   enthusiasm when approached by agents to commit the crime"; that

13   they planned nearly every detail of the robbery without

14   assistance, including how many men they would bring, what

15   weapons they would use, how they would dress, how they would

16   break in to the stash house, how they would restrain any

17   guards, where they would hide after the robbery, where they

18   would sell the stolen cocaine.  They provided the gun,

19   disguises, zip ties necessary to carry out the robbery, etc.,

20   etc.  And they conclude by saying the government's construct

21   did not violate fundamental due process.

22           Anyway, I bring that up -- and that's the quote from

23   the Ninth Circuit case.  That's what we have here.  The

24   defendants brought the guns, they showed up, they planned the

25   robbery, they -- you've heard -- well, you haven't heard the

1    tapes, but you've seen --

2              THE COURT:  I haven't heard the tapes.

3              MR. DIMASE:  -- the PSR that reflects what was said.

4    No one's saying Mr. Rodriguez was involved in those early

5    meetings or that he is as culpable as Mr. Lopez or Guerrero;

6    but he showed up on the day of the robbery with guns, with

7    other people, prepared to commit the robbery and I think, most

8    tellingly, as set forth in paragraph 19 of the PSR, is on tape

9    saying:  I'm going there for all 12.  I didn't come here -- I

10   didn't get involved for just two, referring to kilograms of

11   cocaine.

12             THE COURT:  Right.

13             MR. DIMASE:  So he was in it.

14             THE COURT:  In it to win it.

15             MR. DIMASE:  To commit this robbery, period.  So

16   that's my pitch on the robbery staying arguments by Mr. Dratel.

17             I also just want to briefly address the criminal

18   history.  I won't belabor the points because it's described in

19   the government's submission.  I think what's really concerning

20   here is the escalating nature of Mr. Rodriguez's conduct.  He

21   did have a period where he stayed out of trouble, and that's

22   great.  Unfortunately, after that period he upped the game, and

23   now he's showing up to a robbery with two loaded guns.  Before

24   that it was mostly drug-related crimes, and I think there's a

25   major distinction between selling drugs, on the one hand, and

FB5HRODS                          Sentence

1   engaging in violate acts like committing robberies.  And it is

2   certainly an escalation of his criminal conduct.

3           I think the guidelines set forth in the plea agreement

4   are reasonable.  In fact, the ones calculated by the probation

5   department are actually higher because of the addition of this

6   YO, which the government was not aware of.  We're not seeking

7   that high a range, but I do think that a sentence within the

8   range contemplated by the plea agreement, in light of the

9   defendant's criminal history, the escalating nature of this

10  offense, the sentences he's had in the past which did not deter

11  him, and just the nature and circumstances of the offense

12  itself, I think a sentence within that range is appropriate

13  here, your Honor.

14          So if the Court has any questions, I'm happy to answer

15  them; otherwise, we'll rest on our submission.  Thank you.

16          THE COURT:  Thank you.

17          Mr. Dratel, have you reviewed the presentence report

18  and gone over it with your client?

19          MR. DRATEL:  Yes, your Honor.

20          THE COURT:  Any additions, deletions, or corrections

21  from you?

22          MR. DRATEL:  Our objection -- we had a couple of

23  factual things that were incorporated, but the main one is

24  interpretive issue, legal conclusion, for the Court about the

25  criminal history category in terms -- not so much in terms of

FB5HRODS                          Sentence

1    the calculation, but in terms of whether it overstates the --

2    the criminal history because of --

3            THE COURT:  No.

4            MR. DRATEL:  -- the YO, and all that.  So that's our

5    only --

6            THE COURT:  No, it doesn't.  For me, criminal history

7    is basically how many times have you been involved with the

8    law.  So, no, it doesn't.  So I'll hear you through on

9    sentencing.

10           MR. DRATEL:  Thank you.

11           With the objective, obviously, under the statute of

12   finding a sentence that's sufficient but not greater than

13   necessary, I think the most important thing is going forward,

14   and going forward, Mr. Rodriguez since his arrest has made

15   substantial progress in the almost year now, about 11 months

16   since his arrest.  And what we've submitted -- and I apologize

17   for getting it to you today, but that's when we got it.  I know

18   you're on trial.

19           THE COURT:  Yes, but what a great time to read.

20           MR. DRATEL:  I was here for a little bit.  I

21   understand.

22           But the work that he's doing there is, I think,

23   indicative of what he's capable of, what he has learned, the

24   progress that he's made in this period of time, and this is a

25   program that did not really exist at MDC for people to do.  MDC

FB5HRODS                      Sentence

1  is just devoid of anything unless an inmate actually has the

2  initiative to do it, and this is what Mr. Rodriguez has done.

3  And they've already graduated one class from this program, and

4  they're in the middle of another class that Mr. Rodriguez is

5  doing.  You see the work report today, the various -- very

6  positive language from the counselor as to what Mr. Rodriguez

7  has done.

8             THE COURT:  Yes.

9             MR. DRATEL:  So I think that's hugely important.  I

10  just want to also point out that Mr. Rodriguez's family is

11  here, significant number, to show their support for him.  And

12  that's, I think, also important in the context of what happens

13  in the future.  He's got young kids, and he has recognized from

14  this particular situation and the situation that he put himself

15  in that -- he understands what the future portends for him if

16  he loses the discipline that he showed for half a decade in

17  staying out of any kind of significant -- he had a marijuana

18  arrest during that period.  This, obviously, was a lapse and a

19  significance lapse that he's paying for, and he understands.  I

20  still think that makes a guideline sentence, under either

21  projection of the guidelines, greater than necessary given what

22  we've seen in this year that he's been in so far.

23             I think that another issue -- and, again, this is not

24  negating.  This is mitigating -- is the relative culpability.

25  As the agent told him, you know, when they arrested him -- this

1    is on tape as well -- you're a little fish.  You got in at the

2    very end.  He put in a couple hours that afternoon that he was

3    involved in it.  And, again, not to negate, but to in terms of

4    his particular conduct.  He did not bring the weapons.  They're

5    not his weapons.  He did not handle the weapons.  He did not

6    own them.  No one used them.

7              THE COURT:  No, nobody used them.  They went away.

8    They drove away.

9              MR. DRATEL:  I'm sorry?

10             THE COURT:  They smelled a rat and drove away.

11             MR. DRATEL:  The law -- and I know you have experience

12   as a state court judge.  There's a big difference between

13   attempt and a consummated crime, and I think that the law

14   recognizes that there is a difference.

15             THE COURT:  There is.

16             MR. DRATEL:  And so I think that that's part of the

17   whole constellation of factors.  So I think that is one of them

18   that's important in the context of determining what the

19   appropriate sentence is.  And I know the Court has sentenced

20   Mr. Guerrero to three years.  Mr. Guerrero is the person who

21   recruited Mr. Rodriguez.  They're cousins.  There's a certain

22   level of influence, unfortunately, and I know that there are

23   differences.  I know that Mr. Guerrero did not have a record,

24   but his involvement in the crime was significantly greater than

25   Mr. Rodriguez.

1          THE COURT:  Correct.

2          MR. DRATEL:  I know it's hard to match all of that

3    together, but and I do think there is, you know, a record -- I

4    understand that involvement, you know, on the wrong side of the

5    law is something that just gets cataloged, and the defendant is

6    stuck with it.  But I do think that of these offenses when they

7    involve marijuana, when they're YO, it gets included -- I think

8    about it as a state court practitioner who tells a client that

9    he's got to take a YO or recommend a YO when he's a kid, and

10   then it comes back to haunt him all these years later.

11         THE COURT:  Comes back to haunt him when he commits a

12   crime and they make it federal.

13         MR. DRATEL:  I understand.  But the point is you won't

14   have a record, and that is a record for this purpose.  And no

15   one tells people that that's the ultimate consequence.

16         THE COURT:  No one told people.  I think people are

17   starting to tell them now.

18         MR. DRATEL:  No, now they are.  Collateral

19   consequences, the whole issue of collateral consequences, is

20   now a dominant aspect of sentencing, particularly at the state

21   level for minor offenses.  But at the time, I don't think so.

22         THE COURT:  No, you're absolutely right, at the time

23   it wasn't an issue at all.

24         MR. DRATEL:  I also think there's a difference between

25   a state arrest and the state system and the way that it

disposes of cases.  You know, he has all these points from a

single day of disposition.  And in a federal case, in which the

seriousness of federal court is manifest from the first

appearance in --

THE COURT:  I don't know.  Don't get me started

because usually it's the government who gets slammed by me for

disrespecting the state courts.  I understand there are

differences in the system, but as far as I'm concerned, it's

equally serious; and the judges are capable.  And I have to be

an equal opportunity person here.

MR. DRATEL:  That's not my point.  I'm not talking

about from the judicial -- the systemic point.  I'm talking

about from a defendant's point of view.  It's a very different

set of lessons that you learn being in that system, and this

system teaches those lessons very quickly.  And that's why I

think that this 11-month period and whatever period the Court

seeks to -- thinks is appropriate going forward, at the same

time that when you're talking about what the guidelines look

like, that's to me exorbitant in the context of what the

sentence ought to be for Mr. Rodriguez in this case.  But I

think part of that is the gravity of being in the federal

system and the -- and the wake-up call that it gives to people

who think that the state system and the way it works is just

going to be this revolving door that will allow them in and out

for periods of time.  So I think that that's a factor, and I

1    think that that's reflected, again, in what he has done thus

2    far.

3              We put in the statistics, I think, in terms of

4    guidelines, just to say, 75 percent of the cases in this

5    district are below the guidelines.  And less than 50 percent

6    of -- only 24 percent are government sponsored.  This is for

7    three quarters of fiscal year 2015.  So this is a trend that's

8    been happening since Booker.  It's only increasing since

9    Booker.  I think that reflects a consensus that the guidelines

10   are too high for most offenses, and they reflect sentences that

11   aren't necessary and that sufficient but greater than necessary

12   is below that.  I think that that's part of what we have to

13   deal with in the context of the way the guidelines tend to

14   create this yardstick that the consensus of the entire court

15   here is that it doesn't.

16             So I think that a sentence below the guidelines is

17   appropriate, your Honor.  I think it's sufficient but not

18   greater than necessary.  And I think that we're in the

19   inception or maybe we're in the middle of an era in which

20   recognition about incarceration and reentry and all of those

21   issues that are very important, that we're seeing a change in

22   that.  And I think part of that is an opportunity to get

23   Mr. Rodriguez back into society at the appropriate time, but

24   not longer than necessary, so he can reenter in a way that can

25   take advantage of his talents that he's shown and also while

FB5HRODS                     Sentence

1   he's shown at the MDC.

2           And so that's all I'm asking, your Honor.  Thank you.

3           THE COURT:  Thank you.

4           Anything else from the government?

5           MR. DIMASE:  No, your Honor.

6           THE COURT:  Mr. Rodriguez, you want to say anything to

7   me?

8           THE DEFENDANT:  Yes, ma'am.  Would like to first thank

9   you for allowing me -- taking the time to read my letter to the

10  courts.  I appreciate it a lot.  I'd like to thank the lawyer

11  for the job he have done representing me.  I also like to thank

12  my family for coming.  I don't deserve their support.  They've

13  been here day one.  Of course, they have visit.  They made

14  every e-mail.  They supported me, never left my side when I

15  didn't deserve their support.

16          As you know, my name is Jose Rodriguez.  I grew up in

17  the Bronx.  I didn't really have --

18          THE COURT:  You're talking so fast --

19          THE DEFENDANT:  I'm sorry.

20          THE COURT:  -- that the court reporter is having a

21  really hard time understanding you.

22          THE DEFENDANT:  I'm sorry.  I said my name is Jose

23  Rodriguez, and I'm from the Bronx.  I grew up mostly in the

24  Bronx.  As you mostly know, I didn't come from a bad family, so

25  I came from a family -- my mom was a hard worker.  She always

1    tried support me and my brothers.  It be times that I come home

2    from the street as I got over and I would see her asleep,

3    having books, studying hard so she can achieve to be a greater

4    person.  Things I didn't understand when I was younger, but I

5    understand now, the sacrifice that she made, me becoming a

6    parent couple years ago.  You know, I made mistakes in my life,

7    your Honor.  I'm only human.  And for every mistake that I

8    made, as you see in my rap sheet, I've learned from.

9          When I was 18 -- when I was 18, I got sent to -- I

10   went to the Dominican Republic to play baseball, and I was on

11   the verge of getting signed.  And I tore my rotator cuff, and

12   that destroyed me.  I didn't know what to do with my life.  I

13   came back to New York lost.  And as you see in my record,

14   that's when I started getting in trouble.  Took me a little

15   while to get on my feet, know where I wanted to go.  As time

16   went on, I made that mistake in 2010, I made that decision, and

17   I returned back to this -- to this situation that I'm in now.

18   And, unfortunately, I am in front of you.

19         But I've learned a lot in those times, your Honor.  I

20   have -- came so close to progressing myself in my career, my

21   music.  I had always had jobs, but I decided to leave my job to

22   chase this career full time because I just wanted to give my

23   family a better life.  And I struggled two years, hard working,

24   where I actually started seeing the fruits of my labor, your

25   Honor.  And once I started seeing my music take off, I still

1    decided to have a backup plan to go to school that I was

2    attending before my incarceration, just to better myself and

3    make sure if things don't work out, I have a backup plan, your

4    Honor.  Even though things didn't work out now, I don't want

5    the decision that I made on December 14, that I take full

6    responsibility for and I'm fully guilty of, to be another

7    rotator cuff, your Honor.  I don't want to feel lost again.  I

8    know where I'm going in my life.  I know what I want to do with

9    myself.  I plan on going right back into school, same thing I

10   was doing before, working hard on my music.  This was a great

11   wake-up call.  You know, I didn't let the time I'm incarcerated

12   hinder me.  I try my best to make it positive.  Every day wake

13   up, stay positive.  I try to stay out of trouble because I

14   don't want to put my family through this, you know.

15        I just ask you take into consideration everything my

16   lawyer said, everything that has been said and he's written in

17   his letter.  And I just ask you, don't look at the file that I

18   have on my past, because that's mistakes I cannot change, but I

19   did learn from every single one that I made.  I'm asking you to

20   look at my family letters, look at the pictures I have of my

21   kids.  You know, they mean the world to me.  And I have one

22   standing behind me that's eight years old.  The other one, I

23   didn't want him here because I didn't want him to see his

24   father in this position that I'm in.

25        I just ask that you have mercy and take some type of

1    leniency in me, knowing I learned a lot from my mistake, and

2    every day I'm getting better and better.  I try to make myself

3    a better man, not only for me but for my family.  And I just

4    ask that if you do, I promise not only myself, my family who's

5    sitting behind me, a judge of court, yourself, or the courts,

6    never to be in this situation again.  You'll never see me in

7    this courtroom unless it's for the completion of probation.  I

8    simply ask you to take all those things into consideration.

9    And thank you for allowing me to speak, and God bless the

10   courtroom.  Thank you, your Honor.

11            THE COURT:  Okay.  All right.  Well, first of all,

12   Mr. Dratel, I want to thank you for the excellent presentation,

13   the written presentation, very, very interesting.  I'm not a

14   big fan of government sting operations, pretty much of any

15   sort.  But except in one instance, and the one instance is when

16   the government isn't the initiator of the sting but simply

17   takes advantage of the happenstance that somebody else looking

18   is looking to commit a crime, and that of course is what

19   happened here.  And I also have very different attitudes about

20   people who are inveigled into committing crimes by the

21   government and people who are enthusiastic recruits, to use

22   the Ninth Circuit's formulation.  And I think that my opinions

23   in Cromitie make it clear that I drew a very clear distinction

24   between Mr. Cromitie and the other three individuals who were

25   very enthusiastic recruits.  They weren't in it for very long,

1    but they were in it very happily.

2           I don't know what was going on in your life,

3    Mr. Rodriguez, and I don't know what was going on in your music

4    career, and I don't know what was going on in your relationship

5    with your lady or one of your sons' mothers or your own family,

6    or whatever it was.  I don't know what was going on that caused

7    you to be susceptible to the brandishments of your cousin; but,

8    boy, you were.  And you came in with great enthusiasm into this

9    planned robbery, into this deeply violent planned crime.  And

10   your lawyer points out that I gave your cousin 36 months.  He

11   was in it longer.  He was in it deeper.  He wasn't Mr. Lopez.

12   On the other hand, he was in it pretty much from the beginning,

13   but he didn't have any kind of a record.  I mean, Mr. Ortiz

14   wasn't in it for very long either, but Mr. Ortiz, like you, had

15   a pretty substantial criminal history and a lot of brushes with

16   the law from which he had obviously not learned very much.

17          So when I look at you and your cousin and I look at

18   your relative criminal histories and your relative involvements

19   in the case, frankly, it all kind of balances out with me, you

20   and your cousin, and I think you should do the same amount of

21   time as your cousin and pretty much for two reasons:  The

22   record, including especially the tapes, indicate that you were,

23   if a last-minute participant, a very enthusiastic one.  And you

24   came to this not as a first-timer or a second-timer, possibly,

25   to this kind of crime, but you came into criminal activity

1    having had repeated brushes with the law and having learned

2    little or nothing from them.

3          And it is tragic, as Mr. Dratel points out, because

4    somewhere between the last time you were arrested and pled and

5    the terrible day when this went down, you had actually manned

6    up to your responsibilities as a father, and you were at work

7    on getting certification of some sort to be a tax preparer,

8    which impressed me a whole lot more than the music thing, I

9    have to tell you.  You're about the 850th defendant who I've

10   sentenced who told me he was going to have a music career, and

11   not one of them has actually had a significant music career.

12   And I don't think any of them ever will.  But you were going to

13   do some good, honest work as a tax preparer.  I thought that

14   was great.  But you went off the rails very spectacularly.

15   Very spectacularly.

16         Now, you obviously have drug issues which you are in

17   the process of confronting, and you're confronting them in what

18   I consider to be a very constructive way over at the MDC,

19   helping not only yourself but a lot of other people.  And I am

20   going to recommend, as I recommended for your cousin, that you

21   be considered for the Bureau of Prisons' residential drug

22   assistance program, the 500-hour program.  It seems to me

23   you're a pretty ideal candidate for that program.  You have a

24   history, but you have a demonstrated commitment to turning away

25   from a life of drugs.  And if I were the Bureau of Prisons,

FB5HRODS                    Sentence

1    which I'm not -- and Mr. Dratel will tell you all I can do is

2    recommend.   I can't force them to take you in that program --

3    but if I were the Bureau of Prisons and I looked at this record

4    of what you've done while incarcerated, I would say, hmm, this

5    is one that's worth taking a risk on.   So I will make that

6    recommendation.   I will make it very strongly.   And that may

7    end up cutting some time off your period of incarceration.   I

8    hope you're picked for the program.

9            But considering all of the Section 3553(a) factors,

10   much of what the government says is absolutely true, and taking

11   into account the unbelievably more serious nature of what it is

12   that you involved yourself with here and the obvious fact that

13   much shorter sentences have not driven the point home that you

14   can't do these kinds of things, it seems to me that the

15   sentence that is sufficient, but not greater than necessary, to

16   punish you for what you did is exactly the same thing that was

17   sufficient, but not greater than necessary, to punish your

18   cousin for what he did.   All in the family.   So that's what

19   we're going to do.   And I hope that this is the last time

20   anybody ever has to sentence you to anything.

21           I have reviewed the presentence report.   I accept and

22   adopt as my findings its description of the offense and the

23   offense conduct.   Its calculation of the guidelines is, in

24   fact, correct.   The defendant has 11 criminal history points,

25   and that really does put him in Criminal History Category V,

FB5HRODS                      Sentence

```
 1    not Criminal History Category IV as the government initially
 2    thought.  The total offense level for this crime is 17, and the
 3    guidelines, 46 to 57 months, is the correct guideline.  The
 4    government has indicated that it would advise the Court to
 5    adhere to the guideline calculation in the plea agreement,
 6    which was 37 to 46 months.  It's going to be varying sentence
 7    anyway, but it's a varying sentence of one month from the
 8    government's proposed clarification.  And I thank the
 9    government for standing by the plea agreement.
10            I have considered all of the Section 3553(a) factors,
11    and for the reasons previously articulated conclude that the
12    sentence that satisfies the parsimony clause that deals with
13    the defendant's recidivism and, to this date, inability to
14    learn that no means no, when balanced against his relatively
15    minor role in this endeavor, that a sentence of 36 months is
16    the appropriate sentence for the defendant in this case.  I
17    have taken into account the defendant's good work at the MDC.
18    And, as I said, I believe that the Bureau of Prisons should
19    look very favorably on Mr. Rodriguez when evaluating candidates
20    for the RDAP program.
21            Sir, will you please stand.  Under docket No. 15
22    Criminal 2, the total offense level is 17; the Criminal History
23    Category is V.  This is a varying sentence.  I hereby sentence
24    you, Jose Rodriguez, to be remanded to the custody of the
25    Attorney General of the United States and the Bureau of Prisons
```

1    for a term of 36 months to be followed by a term of three

2    years' supervised release.  You are required to pay a special

3    assessment for the costs of $100.  It's due and payable

4    immediately, but if you can't pay $100 immediately, it will be

5    deducted from your prison wages at the rate of $25 a calendar

6    quarter or 50 percent of your gross monthly earnings from a

7    UNICOR Grade 1 through 4 job.

8            It is my recommendation -- I think this is what you

9    want, Mr. Dratel -- that the defendant be kept in the New York

10   City metropolitan area --

11           MR. DRATEL:  Yes.

12           THE COURT:  -- to facilitate visitation.  The

13   defendant has an excellent relationship with his children, and

14   we would like that to continue.

15           MR. DRATEL:  Thank you, your Honor.

16           THE COURT:  I think it's very important that it

17   continue.  The Court also strongly recommends that

18   Mr. Rodriguez be considered for RDAP.

19           When you get out, sir, you will abide by the following

20   conditions of supervision:  You can't commit another crime.

21   You've gone federal now, and you've gone federal in a big way,

22   felon in possession of a firearm.  The second time that

23   happens, it's quite draconian, but the sentence lasts for a

24   very long time.  So you don't want to do that.  You really

25   don't want to do that, and you don't want to commit any crime,

FB5HRODS                    Sentence

1    federal, state, or local, because I'm kind of a zero tolerance

2    judge.

3            I think you should probably look at me right at this

4    time.

5            I'm a zero tolerance judge.  And if you do commit

6    another crime -- go to state court, go to federal court, I

7    don't care where -- they'll punish you for the crime, but I'm

8    going to punish you, too.  I'm going to punish you for

9    violating the terms of your supervision.  You've got three

10   years under my thumb when you get out.

11           You shall not illegally possess a controlled

12   substance.  If you have a drug, it better be from a pharmacy

13   with your name on the prescription bottle.  You have to

14   participate in a program approved by the United States

15   Probation Office that will include testing to determine whether

16   you have reverted to using controlled substances.  And I

17   authorize the release of available drug treatment evaluations

18   and reports to your substance abuse treatment provider as

19   approved by your probation officer.  You'll be required to

20   contribute to the cost of services rendered in an amount to be

21   determined by your probation officer based on your ability to

22   pay for or the availability of third party payment.

23           You cannot possess a firearm or destructive device.

24   There are no excuses.  There are no exceptions.  There are no

25   justifications whatsoever for a violation of that.

1          You have to cooperate in the collection of genetic

2     identifying material, DNA, for inclusion in criminal databases

3     as directed by your probation officer.

4          You have to obtain legitimate and verifiable

5     employment.  I have to tell you that pursuing your music career

6     is fine in your spare time, but that's not a job.  You have to

7     get a job, a real job, kind of job that the probation officer

8     can call the boss and say:  Is he reporting to work on a

9     regular basis?  Could I see his last three pay stubs?  Has he

10    been giving you any trouble?

11         You can't associate with people who have been

12    convicted of crimes, and you can't be found in places where

13    criminal activity is being planned or carried out.  You seem to

14    have a lovely support system back there, and I think you should

15    associate with them instead of the kind of people that you and

16    your cousin were associating with when you got into this mess.

17         Your probation officer has to know where you live and

18    your probation officer has to know where you work, and you

19    can't change your home address and you can't change your work

20    address without giving ten days' advance notice to your

21    probation officer who then gets to decide whether the place you

22    are proposing to go is an appropriate place.  And if there's an

23    emergency, like there's a gas leak or there's a fire in your

24    apartment and you have to leave very quickly, you only have 48

25    hours to call a probation officer and tell the probation

1    officer where you can be found.

2            You are to report to the nearest probation office

3    within 72 hours of your release from custody.  And it's my

4    recommendation that you be supervised in your district of

5    residence.  You will be given a list of the standard conditions

6    of supervision, and you will acknowledge that you've received

7    it.  And you must abide by all of those except for the special

8    condition on drug treatment as noted.

9            There's no fine being imposed in this case, no

10   restitution, no forfeiture.

11           Okay.  Was there a plea agreement?

12           MR. DIMASE:  Yes, your Honor, there was.

13           THE COURT:  When you took your plea, Mr. Rodriguez,

14   you remember that you signed a letter and the U.S. Attorney

15   signed a letter and Mr. Dratel, they all signed a letter?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  Okay.  In that letter it said if I

18   sentenced you to 46 months or less in prison, that you would

19   not take an appeal from your sentence and you wouldn't bring a

20   lawsuit challenging the legality of that sentence.  Do you

21   recall that?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  Did Mr. Dratel explain to you that by

24   signing the letter, you were giving up the right you would

25   otherwise have to take an appeal from your sentence?

FB5HRODS                        Sentence

1              THE DEFENDANT:  Yes, ma'am.

2              THE COURT:  Okay.  Did you sign the letter of your own

3     free will?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  Okay.  So I've sentenced you to 36 months,

6     which is less than 46 months, so it's my understanding that

7     you've waived your right to take an appeal.  Is that also your

8     understanding?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  Okay.  Now, technically, because I've

11    sentenced you to 36 months instead of 37 months, the government

12    could take an appeal from your sentence.  I doubt very much

13    that's going to happen, but in case it did, you would have the

14    right to be represented by a lawyer and to have counsel

15    appointed to represent you without charge if you couldn't

16    afford a lawyer.

17             Do you understand that?

18             THE DEFENDANT:  I understand.

19             THE COURT:  Okay.  Have a seat.

20             Mr. Dratel, do we have anything else from you?

21             MR. DRATEL:  No, your Honor.  Thank you.

22             THE COURT:  Mr. DiMase, anything from the government?

23             MR. DIMASE:  The government would move to dismiss any

24    open counts against Mr. Rodriguez.

25             THE COURT:  Open counts are dismissed as against the

1   defendant.

2           MR. DIMASE:  Nothing further.

3           THE COURT:  Okay.  Good luck to you, sir.  These

4   proceedings are closed.

5           MR. DRATEL:  Thank you, your Honor.

6           (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25